# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AG Oncon, LLC; AG Ofcon, Ltd.; AQR Absolute Return Master Account, L.P.; AQR DELTA Master Account, L.P.; AQR Delta Sapphire Fund, L.P.; AQR Funds—AQR Diversified Arbitrage Fund; AQR Opportunistic Premium Offshore Fund L.P.; AQR UCITS Funds; CNH CA Master Account, L.P.; CNH Diversified Opportunities Master Account, L.P.; Lazard Asset Management LLC on behalf of certain of its managed accounts; Lazard Rathmore Master Fund, L.P.; HFR CA Lazard Rathmore Master Trust; Lord Abbett Investment Trust – Lord Abbett Convertible Fund; Vermont Mutual Insurance Company; Suttonbrook Capital Portfolio LP; Suttonbrook Eureka Fund, LP;  DBX Convertible Arbitrage 13 Fund; Nomura Waterstone Market Neutral Fund; Prime Capital Master SPC-GOT WAT MAC Segregated Portfolio; Waterstone Offshore ER Fund, LTD; Waterstone Market Neutral MAC 51 Ltd.; Waterstone MF Fund, Ltd.; Waterstone Market Neutral Fund. |    **Civil Action No.:**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br> |
| Plaintiffs, | |
| v. | |
| Jon S. Corzine, J. Randy MacDonald, Henri J. Steenkamp, David P. Bolger, Eileen S. Fusco, David Gelber, Martin J. Glynn, Edward L. Goldberg, David I. Schamis, Robert S. Sloan, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman, Sachs & Co., Jefferies & Company, Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBS Securities Inc., and Sandler O'Neill + Partners, L.P., | |
| Defendants. | |

Plaintiffs AG Oncon, LLC; AG Ofcon Ltd.; AQR Absolute Return Master Account, L.P.;

AQR DELTA Master Account, L.P.; AQR Delta Sapphire Fund, L.P.; AQR Funds—AQR

Diversified Arbitrage Fund; AQR Opportunistic Premium Offshore Fund L.P.;  AQR UCITS

Funds; CNH CA Master Account, L.P.; CNH Diversified Opportunities Master Account, L.P.;
Lazard Asset Management LLC on behalf of certain of its managed accounts; Lazard Rathmore
Master Fund, L.P.; HFR CA Lazard Rathmore Master Trust; Lord Abbett Investment Trust –
Lord Abbett Convertible Fund; Vermont Mutual Insurance Company; Suttonbrook Capital
Portfolio LP; Suttonbrook Eureka Fund, LP; DBX Convertible Arbitrage 13 Fund; Nomura
Waterstone Market Neutral Fund; Prime Capital Master SPC-GOT WAT MAC Segregated
Portfolio; Waterstone Offshore ER Fund, Ltd.; Waterstone Market Neutral MAC 51 Ltd.;
Waterstone MF Fund, Ltd.; Waterstone Market Neutral Fund, severally, by their attorneys, Ross
& Orenstein LLC, for their collective Complaint against some or all Defendants Jon S. Corzine,
J. Randy MacDonald, Henri J. Steenkamp, David P. Bolger, Eileen S. Fusco, David Gelber,
Martin J. Glynn, Edward L. Goldberg, David I. Schamis, Robert S. Sloan, Citigroup Global
Markets Inc., Deutsche Bank Securities Inc., Goldman, Sachs & Co., Jefferies & Company, Inc.,
J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBS
Securities Inc., and Sandler O'Neill + Partners, L.P. ("Defendants") allege, as more particularly
set forth below:

## INTRODUCTION

1.      This is a securities fraud case about material misstatements and omissions made
by MF Global Holdings Limited ("MF Global") and its underwriters in offering documents
provided to purchasers of MF Global debt. MF Global, formerly a leading brokerage firm,
famously collapsed in October 2011 under the weight of risky bets on European sovereign debt.
Acting with intent or recklessness, the underwriter defendants failed to disclose MF Global's
systemic risks to Plaintiffs. Plaintiffs are purchasers of three series of bonds issued by MF
Global in the months leading up to its collapse: 1.875% Convertible Senior Notes due February

1, 2016 (the "2016 Notes"), 3.375% Convertible Senior Notes due August 1, 2018 (the "2018 Notes," and together with the 2016 Notes, the "Convertible Notes"), and 6.25% Senior Notes due August 8, 2016 (the "Senior Notes," and together with the Convertible Notes, the "Notes"). Plaintiffs purchased, in aggregate, more than $100 million face of the Notes.

2.    Plaintiffs were induced to invest in MF Global based on misrepresentations and omissions about MF Global's financial state and profitability, its internal risk controls, and the scope and nature of its exposure to European sovereign debt that permeated its disclosures. This action seeks to hold MF Global's directors, officers, and underwriters accountable for these misrepresentations and omissions, as provided for in the Securities Act of 1933 (the "'33 Act" or "Securities Act"). Each of the defendants was responsible for performing due diligence to ensure that the Notes' offering materials were accurate, and they failed to engage in basic due diligence that would have revealed that MF Global's offering materials misstated its financial state, its internal risk controls, and its exposure to European sovereign debt.

3.    When the truth was revealed about MF Global, the company collapsed and Plaintiffs suffered millions of dollars in damages. As the U.S. House Financial Services Committee's Subcommittee on Oversight & Investigations concluded in a Staff Report dated November 15, 2012 (the "House Subcommittee Report"):

> Had MF Global been more forthright about the size of its European bond portfolio as it amassed those positions, . . . [i]nvestors . . . could have decided for themselves whether the company's investments were sound. MF Global's failure to be fully transparent about the size of its European bond portfolio denied regulators and the public the opportunity to inform themselves about the extent of MF Global's European RTM [repo-to-maturity] trades and to respond accordingly. As a result, the company's investors, customers and counterparties were stunned when the Wall Street Journal reported the size of the company's European bond portfolio in October 2011. The ensuing panic precipitated the company's rapid collapse.

## PARTIES

**Plaintiffs**

4.     Plaintiffs AG Oncon, LLC and AG Ofcon, Ltd. (together, the "AG Plaintiffs") are managed by Angelo Gordon & Co., an investment advisor and their principal place of business is in New York City.  The AG Plaintiffs each purchased $1 million or more publicly registered notes issued by MF Global in 2011 prior to October 31, 2011.

5.     Plaintiffs AQR Absolute Return Master Account, L.P.; AQR DELTA Master Account, L.P.; AQR Delta Sapphire Fund, L.P.; AQR Funds—AQR Diversified Arbitrage Fund; AQR Opportunistic Premium Offshore Fund L.P.; AQR UCITS Funds; CNH CA Master Account, L.P.; and CNH Diversified Opportunities Master Account, L.P. (collectively the "AQR Funds") are managed by AQR Capital Management, LP an investment advisor and their principal place of business is in Greenwich, Connecticut.  The AQR Funds collectively purchased $1 million or more publicly registered notes issued by MF Global in 2011 prior to October 31, 2011.

6.     Plaintiff Lazard Asset Management LLC ("LAM") brings this action on behalf of clients (collectively the "Lazard Clients") from whom it has received valid assignments and which it manages in its principal place of business in New York City.  Plaintiff Lazard Rathmore Master Fund, L.P. (the "LAM Fund") is a fund managed by LAM.  Plaintiff HFR CA Lazard Rathmore Master Trust ("HFR") is a Bermuda unit trust whose investments are managed by LAM.  LAM, the Lazard Clients, the LAM Fund, and HFR are collectively referred to herein as "Lazard." Lazard collectively purchased $1 million or more publicly registered notes issued by MF Global in 2011 prior to October 31, 2011.

7.      Plaintiffs Lord Abbett Investment Trust – Lord Abbett Convertible Fund and Vermont Mutual Insurance Company (collectively the "Lord Abbett Funds") are managed by Lord, Abbett & Co. LLC, an investment advisor and their principal place of business is in Jersey City, New Jersey.   The Lord Abbett Funds collectively purchased $1 million or more publicly registered notes issued by MF Global in 2011 prior to October 31, 2011.

8.      Plaintiffs Suttonbrook Capital Portfolio LP and Suttonbrook Eureka Fund, LP (collectively the "Suttonbrook Funds") are managed by Suttonbrook Capital Management, LP, an investment advisor and their principal place of business is in New York City.   The Suttonbrook Funds collectively purchased $1 million or more publicly registered notes issued by MF Global in 2011 prior to October 31, 2011.

9.      Plaintiffs DBX Convertible Arbitrage 13 Fund; Nomura Waterstone Market Neutral Fund; Prime Capital Master SPC-GOT WAT MAC Segregated Portfolio; Waterstone Offshore ER Fund, Ltd.; Waterstone Market Neutral MAC 51 Ltd.; Waterstone MF Fund, Ltd.; and Waterstone Market Neutral Fund (collectively the "Waterstone Funds") are managed by Waterstone Capital Management, L.P., an investment advisor and their principal place of business in Plymouth, Minnesota.  The Waterstone Funds collectively purchased $1 million or more publicly registered notes issued by MF Global in 2011 prior to October 31, 2011.

10.      Lazard, the Lord Abbett Funds, and the Waterstone Funds all purchased the 2016 Notes and in that context are referred to collectively herein as the "2016 Note Plaintiffs."  All Plaintiffs purchased the 2018 Notes and in that context are referred to collectively as the "2018 Note Plaintiffs."

**Individual Defendants**

11.    Defendant Jon S. Corzine ("Corzine") served as Chairman of the MF Global Board and MF Global's Chief Executive Officer ("CEO") from March 23, 2010 until his resignation on November 4, 2011.

12.    Defendant J. Randy MacDonald ("MacDonald") served as MF Global's Chief Financial Officer ("CFO") from April 2008 through April 2011.   MacDonald signed MF Global's Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010 (the "Registration Statement").

13.    Defendant Henri J. Steenkamp ("Steenkamp") served as MF Global's CFO beginning in April 2011, after serving as MF Global's Chief Accounting Officer. Steenkamp signed the Registration Statement.

14.    Defendants Corzine, MacDonald, and Steenkamp are referred to herein as the "Officer Defendants."

15.    Defendants David P. Bolger ("Bolger"), Eileen S. Fusco ("Fusco"), David Gelber ("Gelber"), Martin J. Glynn ("Glynn"), Edward L. Goldberg ("Goldberg"), David I. Schamis ("Schamis"), and Robert S. Sloan ("Sloan") were members of MF Global's Board throughout 2011.   Defendants Bolger, Fusco, Gelber, Glynn, Goldber, Schamis, and Sloan signed the Registration Statement.

16.    Defendants Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, and Sloan are collectively referred to herein as the "Director Defendants."   The Officer Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

**Underwriter Defendants**

17.     Defendant Citigroup Global Markets Inc. ("Citi") is the brokerage and securities arm of Citigroup Inc., providing commercial and investment banking services. Citi underwrote MF Global's public offerings of the Convertible Notes.

18.     Defendant Deutsche Bank Securities Inc. ("DB") is the U.S. investment banking and securities arm of Deutsche Bank AG. DB underwrote MF Global's public offerings of the Convertible Notes.

19.     Defendant Goldman, Sachs & Co. ("Goldman") is an investment banking, securities, investment management, and financial services firm. Goldman underwrote MF Global's public offerings of the Convertible Notes.

20.     Defendants Jefferies & Company, Inc. ("Jefferies") is an investment banking and securities firm. Jefferies underwrote MF Global's public offering of the Senior Notes.

21.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is the investment banking arm of J.P. Morgan Chase & Co., providing investment banking and brokerage services. J.P. Morgan underwrote MF Global's public offerings of the Convertible Notes.

22.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") is the brokerage, investment banking, and wealth management business of Bank of America Corp. Merrill underwrote MF Global's public offerings of the Convertible Notes and the Senior Notes.

23.     Defendant RBS Securities Inc. ("RBS") is the U.S.-based investment banking affiliate of the Royal Bank of Scotland Group plc. RBS underwrote MF Global's public offerings of the Convertible Notes.

24.     Defendant Sandler O'Neill + Partners, L.P. ("Sandler") is an investment-banking firm and broker-dealer. Sandler underwrote MF Global's public offerings of the 2016 Notes and Senior Notes.

25.     Defendants Citi, DB, Goldman, J.P. Morgan, Merrill, RBS, and Sandler are collectively referred to herein as the "Convertible Underwriter Defendants," and, together with Jefferies, as the "Underwriter Defendants." Jefferies, Merrill, and Sandler, are collectively referred to herein as the "Senior Notes Underwriter Defendants."

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331, because this is a civil action arisig under the laws of the United States.

27.     Venue is proper in this District under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and 28 U.S.C. § 1391(b), (c) and (d). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

## SUBSTANTIVE ALLEGATIONS

**MF Global is rocked by a 2008 rogue trading incident**

28.     MF Global originated as the brokerage division of the British firm Man Group plc, which expanded its brokerage business by purchasing assets left behind when Refco, Inc. went bankrupt in October 2005, and spun this business off in MF Global's 2007 initial public offering ("IPO").

29.     In February 2008, shortly after the IPO, MF Global announced that a rogue trader engaged in unauthorized trades and lost $141 million. This rogue trading incident resulted in MF Global paying nearly $10.5 million in regulatory fines and forced it to begin a public effort to revamp its risk management policies. As a result, MF Global hired two consulting firms to review its risk management policies and hired Michael Roseman ("Roseman") as Chief Risk

Officer ("CRO") in August 2008 to elevate MF Global's risk management capabilities and to implement the recommendations of the two consulting firms.

30.     As one might expect, especially given this history, MF Global's public disclosures in 2010 and 2011 took pains to portray its risk management policies and procedures as robust and effective and emphasized the role and authority of its Chief Risk Officer to lead its risk management efforts.

31.     For example, in its Form 10-K filed May 28, 2010 (the "5/28/10 10-K"), MF Global stated:

> We believe that effective risk management is critical to the success of our business. Consequently, we have established—and continue to evolve and improve—a global enterprise wide risk management framework to manage all aspects of our risks. The risk-management framework globally embeds a *robust risk-management environment* through a *strong governance structure* that (i) clearly defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific individuals, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.
>
> ...
>
> *Our Chief Risk Officer*, who reports directly to our Chief Executive Officer, *leads the risk department and monitors and reports on our risk matters*. The Chief Risk Officer *promotes company-wide adherence to MF Global's enterprise risk management framework and has global responsibility for monitoring and facilitating control of financial, operational and business risks*.
>
> ...
>
> *Our Chief Risk Officer regularly reports to our Board of Directors.* Reports detail global risk exposures and escalate risks that exceed defined tolerances. The risk reporting process is designed to enable us to assess the levels of risk present throughout our operating environment on a near real-time basis and to take any necessary remedial action in a timely manner.

(emphasis added).

32.     In its Definitive Proxy Statement on Form DEF 14A filed June 1, 2010 (the "2010 Proxy"), MF Global stated that:

> The Board is responsible for approving the Company's enterprise risk management policy, based on a recommendation from the Audit and Risk Committee, and approving the Company's risk appetite and limits. The

Company's enterprise risk management approach flows from the Board, which determines the Company's business strategy and risk appetite, and permeates through the Company via *a culture that expects all employees to function as risk managers*; a *strong governance structure* that clearly defines responsibilities; *delegated authorities* for risk control as well as risk taking; and *documented policies and defined methodologies* for risk identification, measurement, control and mitigation.

(emphasis added).

33.     In MF Global's Form 10-K filed May 20, 2011 (the "5/20/11 10-K"), it stated:

We believe that effective risk management is critical to the success of our business and is the responsibility of all of our employees. All of our employees are risk managers. Employees are expected and encouraged to escalate incidents and any matters of concern to management and to our compliance and risk departments in order to effectively manage risk. Consequently, we have established—and continue to evolve and improve—a global enterprise wide risk management framework that is intended to manage all aspects of our risks. The risk-management framework is designed to establish a *global, robust risk-management environment through a strong governance structure* that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.

We seek to identify, assess, measure, monitor and limit market, credit and operational risks across our businesses. Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing our ability to profit from our revenue-generating activities with our exposure to potential losses. Working with the business areas, the Risk department serves as an advisor and facilitates operation within established risk tolerances while seeking to provide acceptable risk-adjusted returns in a controlled manner. Risk-department teams also regularly communicate with our regional officers and to local decision-making bodies to allow us to react rapidly to address any developing risks.

*Our Chief Risk Officer, who reports to our President and Chief Operating Officer, leads the risk department and monitors and reports on our risk matters, including regular reports to our Board of Directors and Audit and Risk Committee.* The Chief Risk Officer promotes company-wide adherence to MF Global's enterprise risk management framework and *has global responsibility for monitoring and facilitating control of market, credit and operational risks*.

(emphasis added).

10

34.    In its Definitive Proxy Statement on Form DEF 14A filed July 7, 2011 (the "2011 Proxy"), MF Global stated:

> The Board has responsibility for providing direction and oversight for management of the Company's business and affairs, establishing the Company's long-term objectives and strategy while overseeing the Company's business performance and management, including risk management. ***The Company's enterprise risk management approach flows from the Board***, which determines the Company's risk appetite, and ***permeates through the Company via a culture that expects all employees to function as risk managers***. This approach involves a ***strong governance structure*** that ***clearly defines responsibilities***, ***delegated authorities for risk control*** as well as risk-taking and ***documented policies*** designed to identify, measure, control and mitigate risk.

(emphasis added).

**Corzine takes over, and transforms, MF Global**

35.    On March 23, 2010, MF Global announced that it had hired Corzine, a former New Jersey Governor, U.S. Senator, and CEO and Chairman of the Goldman Sachs Group, Inc. ("Goldman Sachs"), as its new CEO and Chairman of the Board.

36.    Prior to Corzine's hiring, MF Global had engaged in little proprietary trading. Instead, as noted in its Form 10-K for the fiscal year ending March 31, 2009, its revenue came primarily from commission fees for brokerage services and interest income on cash held in customer accounts. But these traditional sources of MF Global's revenue were being challenged by the rise of online brokerages, which offered traders lower commission rates, and the low interest rates following the 2008 financial crisis.

37.    As Corzine testified before the House Agriculture Committee in December 2011, he led a strategic review of MF Global's business resulting in a "new business plan" under which "MF Global would evolve into a broker-dealer, and ultimately into an investment bank." In other words, Corzine sought to remake MF Global as a mini version of Goldman Sachs.

38.    A significant part of this transformation was an explosion in MF Global's proprietary trading, or trading on its own behalf.  In June 2010, a new trading division within MF Global, the Principal Strategies Group ("PSG"), began proprietary trading activities. Unbeknownst to the public and MF Global's investors, Corzine himself was personally engaged in these proprietary trades, maintaining a personal trading account bearing his initials (JSC) to track proprietary trades that he personally executed or directed others to execute on his behalf.

**Corzine bets the company on European sovereign debt**

39.    When Corzine took the helm at MF Global, he was faced with the need to immediately boost its profits in order to maintain investment-grade credit ratings from the ratings agencies.  For example, Moody's informed MF Global that it would need to generate $200 to $300 in annual pre-tax profits and reduce its leverage in order to maintain its Baa2 rating. In addition, Corzine was motivated to boost MF Global's stock price in order to get his personal stock options "in the money."

40.    Because of this need to boost MF Global's profits, Corzine decided to trade heavily in the sovereign debt of economically-distressed European nations through repo-to-maturity (or "RTM") transactions.  A RTM transaction is a type of repurchase or "repo" transaction—a transaction where one firm sells a security to another firm with an agreement to repurchase the security on a specified date—where the transaction terminates on the maturity date of the security.

41.    By structuring its European sovereign debt trades as RTM transactions, MF Global was able to account for trades as if they were sales, and immediately book profits at the time of the initial trade. In addition, the RTM transactions are "de-recognized," meaning the

trades do not appear on the company's balance sheet and the underlying security is not accounted for in any value-at-risk ("VAR") calculations—a standard risk-management metric.

42.     In these MF Global European sovereign debt RTM transactions, sovereign debt securities purchased by MF Global Inc. ("MFGI"), the North American broker-dealer subsidiary of MF Global, was repoed back to a U.K.-based MF Global subsidiary, MF Global U.K. Limited ("MFG-UK"). MFG-UK then entered into a corresponding repo transaction with LCH.Clearnet (formerly known as the London Clearing House) ("LCH"). This repo transaction between MFG-UK and LCH was for a term two days shorter than the maturity date of the underlying bonds, however, meaning that more cash was needed by MF Global to maintain the RTM portfolio.

43.     Even though these RTM transactions were derecognized and thus not part of MF Global's balance sheet or VAR calculations, MF Global retained significant risks. As Corzine himself explained in his testimony before the House Agriculture Committee, MF Global retained two significant types of risk:

> a.     **Default risk:** "MF Global retained . . . the risk that the debt securities might default or be restructured" in which case "MF Global would not be paid in full at maturity" but "would still have the obligation to buy back the debt security from the Counterparty in full" and

> b.     **Liquidity risk:** MF Global retained the risk that "the clearing house . . . could demand that MF Global increase its margin" either because "it determined MF Global was not credit-worthy" or "that the underlying debt security . . . decreased in value."

44.     MF Global frequently relied on these RTM trades in order to make it appear that the company was meeting its quarterly revenue goals. Near the end of several quarters in 2010

and 2011, Corzine would place RTM trades in order to generate revenue, requesting calculations from the company's financial personnel regarding the level of RTM trades necessary to allow the company to report that it had reached its earnings targets.

45.     In 2010 and 2011, MF Global's European sovereign debt investments ballooned.

a.     In MF Global's Form 10-Q filed February 3, 2011 (the "2/3/11 10-Q"), it disclosed that, as of December 31, 2010, it owned **$1.5 billion** in "Foreign government bonds" without stating which foreign governments issued those bonds, and it "derecognized" $7.6 billion in "securities sold under agreements to repurchase" without disclosing how much of that total related to European sovereign debt.  Subsequent filings included more detail, and showed a dramatic rise in the amount of MF Global's European sovereign debt exposure.

b.     MF Global's Form 10-K filed May 20, 2011 (the "5/20/11 10-K") disclosed "other sovereign obligations . . . issued by a group of Western European countries, consisting of Italy, Spain, Belgium, Portugal, and Ireland" with a "notional value of the issuer risk . . . net of hedging transactions" of **$6.3 billion** as of March 31, 2011.  The 5/20/11 10-K also discloses that on March 31, 2011, "securities sold under agreements to repurchase of $14,520,341[,000], at contract value, were de-recognized, of which 52.6% were collateralized with European sovereign debt."  In other words, as of March 31, 2011, **$7.6 billion** in European sovereign debt RTM transactions (52.6% of $14.52 billion) were removed from MF Global's balance sheet and VAR calculations.

c.     MF Global's Form 10-Q filed August 3, 2011 (the "8/3/11 10-Q") disclosed that the notional value "net of hedging transactions" of its holdings of

"other sovereign obligations," again consisting of "sovereign obligations . . . issued by a group of Western European countries, consisting of Italy, Spain, Belgium, Portugal, and Ireland" was **$6.4 billion** as of June 30, 2011.  The 8/3/11 10-Q also discloses that on June 30, 2011, "securities sold under agreements to repurchase of $16,548,450[,000] . . ., at contract value, were derecognized, of which 69.3% . . . were collateralized with European sovereign debt, consisting of Italy, Spain, Belgium, Portugal and Ireland."  In other words, as of June 30, 2011, **$11.5 billion** in European sovereign debt transactions (69.3% of $16.55 billion) were removed from MF Global's balance sheet and VAR calculations, a 50% increase from the $7.6 billion at the end of the prior quarter.

**MF Global ignores and fails to disclose repeated risk management concerns and failures**

46.     As Corzine took over MF Global and increased its proprietary trading, its risk management systems failed to keep up. Throughout 2010 and 2011, significant gaps in the risk management system were brought to the attention of the MF Global Board but were not addressed, and its European sovereign debt trading, under the direction of Corzine, repeatedly breached the limits set by the Board. Even more fundamentally, MF Global's entire risk management system was upside-down and contrary to its public representations—the chief trader in charge of its most risky strategy was not someone who the Chief Risk Officer could oversee, it was in fact the CEO and Chairman of the company, Jon Corzine himself. None of these facts were disclosed to MF Global's investors, including Plaintiffs, until it was too late.

47.     James Giddens, the Trustee for the liquidation of MFGI under the Securities Investor Protection Act, detailed many of these risk management failures in a June 4, 2012 investigation report (the "Giddens Report"). Specifically, the Giddens Report details a

presentation to MF Global's Board in April 2010 detailing "dozens of gaps in policies, procedures and technologies . . . in the various risk areas" and a "follow up report to the Board in October 2010 [that] continued to reflect many critical or high risk gaps in risk policies."

48.     The Giddens Report also details several internal audit reviews that also raised concerns that were not addressed and contributed to MF Global's collapse:

     a.     "A Corporate Governance internal audit issued in May 2010 identified MF Global's risk policies as not congruent with the changes to its broker-dealer business. Among the specific gaps identified by Internal Audit was liquidity risk reporting."

     b.     "[A]n Internal Audit report on Market and Credit Risk Management in October 2010 identified "High Risk" areas arising from the lack of controls over risk reporting. The report also reiterated that market risk policies had not been updated to reflect the current operating environment. The report attributed the failures to remediate gaps to staffing and budget constraints."

     c.     "[D]uring 2011, Internal Audit expressed concern that the absence of reliable liquidity reporting tools and dependence on Ms. O'Brien's [Edith O'Brien, the Assistant Treasurer] comprehensive knowledge of liquidity issues might represent a 'key man risk,' because the processes supporting the composition of the liquidity forecast were not documented and were mainly based on Ms. O'Brien's expertise and experience."

     d.     An Internal Audit investigation regarding US financial regulatory reporting conducted in the Fall of 2010 raised concerns, as detailed in a final report dated March 31, 2011 which stated that "in a variety of instances, the

controls are not in place and not all aspects of these controls are documented as evidence that they have been performed."

49.     More significantly, the role of Defendant Corzine in the everyday trading decisions relating to MF Global's enormous bet on European sovereign debt made meaningful risk management and oversight impossible. In 2010 and 2011, Corzine repeatedly breached the trading limits set by the board, brushed aside concerns expressed by MF Global's Chief Risk Officer and then replaced him, and even threatened to quit if the Board did not accede to his repeated demands to raise the European sovereign debt trading limits. For example:

a.     In March 2010, when Corzine joined the company, MF Global's European sovereign debt limits was less than $500 million. Within a few months, by June or July 2010, Corzine and others sought to increase the trading limits, and MF Global's CRO at the time, Roseman agreed to raise the limits to $1 billion.

b.     By mid-September 2010, this limit had already been exceeded, and after exceeding the limit, Corzine sought an increase in the limit to $1.5 billion. Roseman, according to his testimony before a House subcommittee, expressed to Corzine his "increasing concerns" about "the potential capital risk" and "began to express caution on the growing liquidity risk."

c.     But these limits were again exceeded, and, according to the Giddens Report, "on September 22, 2010, in response to Mr. Corzine's request, the Executive Committee of the Board of Directors approved an increase in the limit to $4.0 billion. Less than two months later [in November 2010], Mr. Corzine requested and the Board approved another increase, to $4.75 billion." By this point, Roseman testified that he was growing more concerned both about the

"capital risk" associated with MF Global's growing position as well as "the liquidity risk relative to the risk appetite." While presenting Corzine's November 2010 request to the Board, Roseman also presented "a detailed analysis of the potential liquidity risk stress scenarios" and "an analysis on the CDS market" while "highlight[ing] the significant capital risk given the sovereign default risk associated with the unresolved financial issues in Europe." The Board's approval of this $4.75 billion limit in November 2010 was conditioned on a reevaluation of those limits in early 2011.

d.      Even though Corzine succeeded in increasing the European sovereign debt trading limits by 950% in 2010 – from $500 million to $4.75 billion – over the objections of Roseman, he was not satisfied with this limit or with Roseman's continued warnings. In November 2010, Corzine informed Roseman that he would no longer report directly to the Board, but would report instead to Bradley Abelow, MF's Chief Operating Officer. Abelow had previously worked with Corzine at Goldman and served as Corzine's chief of staff when he was Governor of New Jersey.

e.      In January 2010, Roseman was terminated as CRO, and replaced with Michael Stockman ("Stockman"), who did not have the necessary experience regarding global debt trading or liquidity analysis. According to multiple news reports following MF Global's bankruptcy and two senior MF Global executives quoted in the Consolidated Amended Securities Class Action Complaint in *In re MF Global Holdings Limited Securities Litigation* (the "Securities Class Action Complaint"), Roseman was fired and replaced with Stockman because Corzine

disagreed with Stockman's warnings about the risks of MF Global's increasing European sovereign debt exposure. Although MF Global disclosed in its 2/3/11 10-Q that Roseman "received notice from us on January 31, 2011 that his employment will end on April 1, 2011," it never disclosed Roseman's warnings, or that they were the cause of his termination. Stockman also reported to Abelow rather than the Board.

f.      In January 2011, according to the Giddens Report, the MF Global Board directed that the "European sovereign debt portfolio would run down as planned with no additional positions placed unless Mr. Corzine obtained further approval from the Board of Directors." But Corzine did not follow this directive, and instead increased MF Global's European sovereign debt exposure. The Board's debt limits were exceeded on February 3, 2011, but the Board was not informed. Although Corzine wanted an even larger increase in the limits, risk personnel persuaded him that an increase to $5 billion was "big enough." In March 2011, Stockman prepared a request to the Board to raise the debt limits to $5 billion, with a temporary limit of $5.8 billion to expire at the end of March, and the Board approved these requests.

g.      As the end of March 2011 approached, Corzine directed Stockman to request that the Board increase the limit to $6 billion. Instead, the Board extended the temporary $5.8 billion limit until September 2011. But Corzine continued to resist any oversight of his trading, and had breached these limits within a month, according to the Giddens Report (citing to an April 27 sovereign debt portfolio

report). After conferring with Corzine, Stockman commented to other risk personnel, "Good news is he is now aware of gross limits, agrees with concept…"

h.    In early June 2011, Corzine again requested an increase in the limits, this time to $9.75 billion. The Board agreed to raise the limit to $6.6 billion. But by July 2011, even Stockman was becoming concerned about MF Global's sovereign debt exposure. Stockman called two meetings in July 2011 to discuss a number of risks associated with MF Global's RTM trades, and told Corzine in a July 30, 2011 email that "I am not currently supportive of buying more sovereigns" because he was concerned about margin calls "in light and heavier stress scenarios."

i.    Throughout this entire process, Corzine abused his position as CEO to increase MF Global's European sovereign debt exposure and short-circuit any meaningful risk management or oversight. On at least two occasions, Corzine threatened to resign if his request to raise the limits on European sovereign debt was not granted. Concerns about Corzine's role were raised internally immediately when he first indicated he wanted to personally place trades, as FINRA rules and MF Global's internal policies required supervision of trades by senior officers, but there was no MF Global officer senior to Corzine. According to the Giddens Report, "[a] compromise was reached pursuant to which, *inter alia*, a subcommittee of the Board reviewed both the trades by Mr. Corzine himself and those he placed through others." Neither these concerns, nor the compromise reached, were disclosed to investors.

50.   Reviewing these facts, the House Subcommittee Report concluded:

These risks [associated with MF's European sovereign debt exposure] were compounded by the *atmosphere that Corzine created at MF Global, in which no one could challenge his decisions*. He hired his former gubernatorial chief of staff, Bradley Abelow, to serve as the company's COO. When Michael Roseman, the company's CRO, disagreed with Corzine about the size of the company's European bond portfolio, Corzine directed Roseman to report to Abelow rather than to MF Global's board of directors. This change effectively sidelined the most senior individual charged with monitoring the company's risks and deprived the board of an independent assessment of the risks that Corzine's European RTM trades posed to MF Global, its shareholders, and its customers. Additionally, *by acting as the de facto chief trader for the company, Corzine insulated his trading activities from the company's normal risk management review process*. He negotiated the size of the company's European bond portfolio solely with MF Global's board of directors, which he chaired. Consequently, Corzine quickly built the company's European bond portfolio well in excess of prudent limits without effective resistance.

(emphasis added).

51.     Thus, while claiming to have a robust risk management system, MF Global failed to disclose at least the following material facts until it was too late:

- The repeated significant breakdowns in its risk management system;

- Its CEO's role as its chief trader, rendering meaningful risk management impossible;

- The concerns raised by its CRO about its sovereign debt trading strategy; and

- The fact that its CRO was terminated because he raised concerns about its exploding European sovereign debt exposure.

**MF Global materially overstates its Deferred Tax Assets.**

52.     Deferred Tax Assets are losses, credits, or tax deductions that may be used to offset taxable income in future years. Because Deferred Tax Assets could be used in the future to offset taxable income and thus reduce a company's taxes, they can only be recorded under Generally Accepted Accounting Principles ("GAAP") if it is "more likely than not" that they will be realized in the future.

53.     In 2010 and 2011, MF Global's financial statements, which it always attested were prepared in accordance with GAAP, reflected significant Deferred Tax Assets that could not be justified under GAAP because MF Global had been suffering cumulative losses for several years and had no reasonable expectation of profitability in the near future.

54.     Under applicable GAAP rules, a cumulative pre-tax loss for the preceding three years is considered "significant negative evidence" that must be counteracted with specific and reliable positive evidence before Deferred Tax Assets can be fully recorded.

55.     Based on GAAP accounting, by no later than May 20, 2010, when MF Global announced its financial results for the fiscal year ending March 31, 2010, it should have recorded a valuation allowance against its U.S. Deferred Tax Assets because it was operating at a three-year cumulative loss as of March 31, 2010 and it did not have sufficient evidence to counteract that negative evidence.

56.     Specifically, a major cause of MF Global's lack of profitability was the low interest rate environment. As noted in the Gibbons Report, "MF Global had historically generated a substantial portion of its income from interest generated from repurchase agreements, government securities . . ., and failed transaction fees," and as a result of the Federal Reserve's decision to cut the Federal Funds rate to "essentially zero following the financial crisis

in the fall of 2008," MF Global saw a "dramatic decline in [its] interest income." MF Global understood that this low interest rate environment was almost certain to continue for the near-future.

57.    In its 5/28/10 10-K, MF Global did not even mention its cumulative losses, or give any justification for its accounting treatment of its Deferred Tax Assets. In its 5/20/11 10-K, MF Global finally acknowledged that "[t]he Company is in a three-year cumulative pre-tax loss position at March 31, 2011 in many jurisdictions in which it does business," but did not specify that the United States was one of those jurisdictions, even though the bulk of MF Global's revenues were generated in the U.S. and the bulk of its claimed Deferred Tax Assets were located in the United States.

58.    Although MF Global conceded that this "cumulative loss position is considered negative evidence in assessing the realizability of deferred tax assets," it "concluded that the weight given this negative evidence is diminished due to significant non-recurring loss and expense items recognized during the prior three years," and "there is sufficient positive evidence to overcome this negative evidence." This positive evidence consisted of "three means by which we are fully able to realize our deferred tax assets": (1) "the reversal of existing taxable temporary differences;" (2) "future projections of income;" and (3) "a sufficient tax planning strategy."

59.    MF Global offered no explanation for what it meant by "the reversal of existing taxable temporary differences," and the other two types of asserted positive evidence were, in fact, lacking any reasonable basis, because:

        a.    Projections are generally not sufficient under GAAP to overcome the negative evidence of cumulative losses in recent years. In MF Global's case, it

was attempting to transform its business into an investment bank, and the only revenue source it had actually recognized was its new trading business led by Corzine. But the short-term trading revenues that MF Global had realized were unreliable and unsustainable as they only generated additional revenues if MF Global was willing to continually increase its European sovereign debt exposure.

b.      Although MF Global claimed that its revenue projections were also reliable based on "significant changes" to its compensation structure, MF Global never actually implemented these supposed changes, and they were too unsettled in early 2011 to provide sufficient positive evidence to overcome the negative evidence provided by MF Global's cumulative pre-tax losses.

c.      MF Global did not apparently have any independent "tax planning strategy" other than its forecasts that it would return to profitability. As MF Global conceded, "[t]he amount of the deferred tax asset considered realizable, however, could be significantly reduced in the near term if our actual results are significantly less than forecast."

60.      In fact, on October 25, 2011, MF Global admitted for the first time that it was required to write down a significant amount of its Deferred Tax Assets. On that day, it announced a $191.6 million quarterly loss. Over half of that loss was caused by "valuation allowances against deferred tax assets of $119.4 million." Within a week, MF Global filed for bankruptcy.

**MF Global engages in a "shell game" of internal transfers to conceal its liquidity crisis.**

61.   As MF Global dramatically increased its European sovereign debt exposure, its liquidity position became more and more precarious, as the demands for margin funding increased and the company was forced to find new ways to satisfy margin demands.

62.   Beginning in late May 2011, Corzine directed MF Global traders to begin entering into short RTM positions in order to free up liquidity. But these short RTM positions posed another potential liquidity threat, because they had a shorter duration than the offsetting long positions and therefore, when they matured, they would no longer offset the long positions.

63.   In addition, MF Global concealed its liquidity problems through a shell game of internal transfers that began at least in late 2010 and escalated throughout 2011 until MF Global's eventual collapse.

64.   According to the Giddens Report, "for at least a year prior to [October 31, 2011], the FCM [MF Global's Chicago-based futures commodity merchant business] had provided intraday transfers to Operations in New York," which were "typically repaid intraday but some transferred amounts remained in securities accounts overnight or longer." These transfers caused concerns within MF Global, as "[i]ndividuals in Chicago were increasingly frustrated that that FCM was being used to fund the non-FCM business."

65.   This cash situation grew so dire in the summer of 2011 that Edith O'Brien, the Chicago-based Assistant Treasurer of MF Global, stated in an August 11, 2011 email that she needed "to spend hours every day shuffling cash and loans from entity to entity," which she described as a "shell game."

66.   According to the Giddens Report, in July 2011, Steenkamp, the MF Global CFO, asked Christine Serwinski ("Serwinski"), the North American CFO of MFGI, to "consider whether $250 million in funds could be 'loaned' overnight from the FCM to Operations in New

York." Serwinski expressed her concern in a July 19 email that it sounded like "the *customer funds* not required from a secured regulatory computation *would be tapped into*."

67.   The Giddens Report also states that "during the summer of 2011, the intraday transfers that had commenced the year before became a daily occurrence. In addition to the intraday transfers, there were other transfers from the FCM that were kept overnight or longer."

68.   Ultimately, this "shell game" grew over the summer and fall of 2011 until the music stopped in October and November, when it was discovered that the FCM business was missing a shocking $1.2 billion in customer funds.

**MF Global's materially misleading bond offerings.**

**1. The 2016 Notes**

69.   On February 11, 2011, MF Global completed a $287.5 million offering of the 2016 Notes (the "2016 Notes Offering"). The 2016 Notes Offering was conducted pursuant to the Registration Statement, as well as a Preliminary Prospectus Supplement and Pricing Term Sheet dated February 7, 2011, and a Final Prospectus Supplement dated February 7, 2011 (collectively, the "2016 Notes Offering Materials").

70.   The 2016 Notes Offering was underwritten by Goldman, Citi, DB, Merrill, J.P. Morgan, RBS and Sandler. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2016 Notes Offering.

71.   The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 2016 Notes Offering Materials.

72.     The 2016 Notes Offering Materials specifically incorporated by reference the 5/28/10 10-K, the 2010 Proxy, and the 2/3/11 10-Q.

73.     These documents, by which the 2016 Note Plaintiffs were induced to purchase the 2016 Notes, contained at least the following untrue statements or omissions of material fact:

- **Risk management:** Making representations about MF Global's allegedly effective risk management system without disclosing (1) multiple known breakdowns of that system, including repeated breaches of the trading limits; (2) Corzine's personal trading activity compromising the effectiveness of that system; (3) the fact that its CRO had raised concerns about the wisdom of its risky trading strategy, and (4) the fact that Stockman was terminated as CRO for raising these concerns.

- **Scope of its European sovereign debt exposure:** The only disclosure in the 2016 Notes Offering Materials about MF Global's European sovereign debt trading strategy was its statement in the 2/3/11 10-Q that, as of December 31, 2010, it owned $1.5 billion in "Foreign government bonds" and it "derecognized" $7.6 billion in "securities sold under agreements to repurchase" without disclosing how much of that total related to European sovereign debt. In fact, by the time of 2016 Notes Offering in February 2011, the Board's trading limit of $4.75 billion in European sovereign debt exposure had been exceeded on February 3, 2011, according to the Giddens Report.

- **Deferred Tax Assets:** Although MF Global consistently represented that its financial statements were prepared in accordance with GAAP, the financial statements incorporated into the 2016 Notes Offering Materials improperly included over $100 million in Deferred Tax Assets, which MF Global should have written down based on GAAP requirements.

- **Liquidity:** MF Global did not disclose its growing liquidity problems, and instead began regular intra-company transfers in late 2010 to conceal those concerns.

### 2. The 2018 Notes and the Senior Notes

74.   On July 28, 2011, MF Global issued approximately $325 million of the 2018 Notes (the "2018 Notes Offering"). The 2018 Notes Offering was conducted pursuant to the Registration Statement, as well as a Preliminary Prospectus Supplement and Pricing Term Sheet dated July 28, 2011, and a Final Prospectus Supplement, dated August 1, 2011 (collectively, the "2018 Notes Offering Materials").

75.   The 2018 Notes Offering was underwritten by Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2018 Notes Offering.

76.   On August 3, 2011, MF Global issued approximately $325 million of the Senior Notes (the "Senior Notes Offering"). The Senior Notes Offering was conducted pursuant to the Registration Statement, as well as a Prospectus Supplement and Free Writing Prospectus dated August 3, 2011 (collectively, the "Senior Notes Offering Materials," and together with the 2016 Notes Offering Materials and the 2018 Notes Offering Materials, the "Offering Materials").

77.   The Senior Notes Offering was underwritten, *inter alia*, by the Senior Notes Underwriter Defendants. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the Senior Notes Offering.

78.   The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 2018 Notes Offering Materials and the Senior Notes Offering Materials.

79.     The 2018 Notes Offering Materials and Senior Notes Offering Materials specifically incorporated by reference the 5/20/11 10-K and the 2011 Proxy.  The Senior Notes Offering Materials also incorporated by reference the 8/3/11 10-Q.

80.     These documents, by which the 2018 Note Plaintiffs were induced to purchase the 2018 Notes and Waterstone Funds were induced to purchase the Senior Notes, contained at least the following untrue statements or omissions of material fact:

- **Risk management:** Making representations about MF Global's allegedly effective risk management system without disclosing (1) multiple known breakdowns of that system, including repeated breaches of the trading limits; (2) Corzine's personal trading activity compromising the effectiveness of that system; (3) the fact that its CRO had raised concerns about the wisdom of its risky trading strategy, and (4) the fact that Stockman was terminated as CRO for raising these concerns.

- **Scope of its European sovereign debt exposure:** The most recent disclosure in the 2018 Notes Offering Materials about MF Global's European sovereign debt trading exposure was that it held "other sovereign obligations . . . issued by a group of Western European countries, consisting of Italy, Spain, Belgium, Portugal, and Ireland" with a "notional value of the issuer risk . . . net of hedging transactions" of $6.3 billion as of March 31, 2011 and that on March 31, 2011, "securities sold under agreements to repurchase of $14,520,341[,000], at contract value, were de-recognized, of which 52.6% were collateralized with European sovereign debt," meaning that $7.6 billion in European sovereign debt RTM transactions (52.6% of $14.52 billion) were removed from MF Global's balance sheet and VAR calculations. Only *two days after the closing of the 2018 Notes Offering*, MF Global issued the 8/3/11 10-Q which disclosed that $11.5

billion in European sovereign debt transactions were removed from MF Global's balance sheet and VAR calculations, a *50% increase* from the $7.6 billion at the end of the prior quarter.

- **Deferred Tax Assets:** Although MF Global consistently represented that its financial statements were prepared in accordance with GAAP, the financial statements incorporated into the 2018 Notes Offering Materials improperly included over $100 million in Deferred Tax Assets, which MF Global should have written down based on GAAP requirements.

- **Liquidity:** MF Global did not disclose its growing liquidity problems, and instead began regular intra-company transfers in late 2010 to conceal those concerns, with those transfers escalating through the summer of 2011.

**Defendants' failure to perform the required due diligence**

81.    Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Materials were accurate and complete and not misstated in any material respects.

82.    The Securities Act places the burden of due diligence in a securities offering on the underwriters and the issuer's directors and officers, because of their superior expertise and access to the issuer's financial information. In performing this due diligence obligation, an underwriter must play a devil's advocate role and conduct a meaningful investigation, rather than simply relying on management's explanations of a company's affairs. At a minimum, this due diligence process must include:

- a thorough review of all available financial data, including an examination of the issuer's audits and communication from the company's auditor;

- a critical "line-by-line" review of the offering materials, including financial statements and other SEC filings incorporated therein;

- interviews of upper and mid-level management;

- reviews of the company's internal controls and risk management procedures;

- reviews of any non-public internal documents concerning the issuer's financial state or internal controls and risk management procedures.

83.     If the Defendants had performed the due diligence required of them, they would have discovered that MF Global's Offering Materials were false and misleading in several material respects, as alleged herein. For example:

- if Defendants had critically reviewed MF Global's internal documents and conducted management interviews, they certainly would have discovered that the Offering Materials painted a false and misleading picture about MF Global's failing risk management system, beginning with the fact that the CEO was functioning as the chief trader, without any effective risk management controls;

- a critical review of internal documents and critical examination of MF Global's financial statements would have revealed that MF Global was not adequately and truthfully disclosing its exposure to European sovereign debt;

- a critical examination of MF Global's accounting would have revealed that it had no reasonable basis for its claimed Deferred Tax Assets; and

- a critical review of internal documents and management interviews would have revealed that MF Global was suffering from significant and material liquidity challenges that were not disclosed in the Offering Materials.

**MF Global's collapse**

84.     Following MF Global's filing of the 5/20/11 10-K, FINRA became concerned about the scope of its European sovereign debt RTM transactions, and began to investigate whether MF Global was properly meeting its net capital requirements. FINRA's ultimate conclusion was that MF Global needed to reserve significant additional capital to offset the risks posed by the RTM transactions.

85.     MF Global commenced an intense lobbying effort in Washington to resist FINRA's proposed additional capital reserve, including at least one in-person meeting between Corzine the SEC on or about August 15, 2011. But MF Global's lobbying efforts failed, and on August 24, 2011, FINRA informed MF Global that it was required to take a $257 million charge on its European sovereign debt RTM transactions. On September 1, 2011, MF Global filed a Form 10-Q/A disclosing this required change in the net capital treatment of its RTM transactions.

86.     Although this 10-Q/A stated that MF Global "does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans," in fact this change exacerbated MF Global's already dire (but undisclosed) liquidity crisis.

87.     In addition, FINRA required MF Global to make additional public disclosures about its European sovereign debt exposure. These additional disclosures were made on October 25, 2011, when MF Global announced its quarterly financial results.

88.     On October 25, 2011, as noted above, MF Global announced a quarterly loss of $191.6 million, over half of which was the result of its belated write-down of $119.4 million of its claimed Deferred Tax Assets. These announcements were met with a swift negative reaction

from the financial markets, analysts, and ratings agencies, and by October 31, 2011, MF Global

had filed for bankruptcy.

89.    The House Subcommittee Report makes clear the connection between discovery

of the fraud perpetrated by Defendants and the ultimate collapse of MF Global:

> Rather than hold the European bonds on MF Global's books, which could expose
> the company to earnings volatility, Corzine chose to use these bonds as collateral
> in European RTM trades, permitting the company to book quick profits and
> "derecognize" the bonds from its balance sheet. *As a result, MF Global did not
> initially disclose the full extent of its holdings in discussions with FINRA or in
> its public SEC filings, which meant that regulators and the investing public
> were not aware of all of the risks facing the company.* By October 2011, MF
> Global had accumulated considerable exposure to European debt. The company's
> net European RTM portfolio was $6.3 billion, which amounted to 14 percent of
> MF Global's total assets and was orders of magnitude greater than the relative
> exposure of its larger competitors. *The revelation of the surprising size of the
> company's portfolio, coupled with poor earnings news, prompted the credit
> rating agencies to downgrade the company's rating to junk status and set off a
> "run on the bank"* by MF Global's investors, customers, counterparties, creating
> extraordinary demands upon the company's capital and liquidity reserves.

(emphasis added).

## COUNT I
### Section 11 of the '33 Act
### On behalf of all 2016 Note Plaintiffs
### Against all Underwriter Defendants

90.    The preceding paragraphs of the Complaint are incorporated as if stated fully

herein.

91.    Underwriter Defendants Citi, DB, Goldman, Merrill, J.P. Morgan, RBS and

Sandler underwrote the 2016 Notes Offering.

92.    As set forth above, the 2016 Notes Offering Materials contained untrue statements

of material fact, including the financial statements and internal controls of MF Global. In

addition, the 2016 Notes Offering Materials omitted to state other facts required to be stated

therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

93.    The Underwriter Defendants owed to the 2016 Note Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2016 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

94.    The Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2016 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2016 Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

95.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 2016 Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. The Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements,

assessments of internal controls, and other disclosures, and they were negligent in failing to do so sufficiently in connection with the 2016 Notes Offering.

96.     The 2016 Note Plaintiffs purchased the 2016 Notes issued pursuant or traceable to the 2016 Notes Offering Materials, and were damaged thereby.

97.     The 2016 Note Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired their securities.

98.     Therefore, the Underwriter Defendants are liable to the 2016 Note Plaintiffs for violations of Section 11 of the '33 Act.

## COUNT II
### Section 11 of the '33 Act
### On behalf of the Lord Abbett Plaintiffs and the Waterstone Plaintiffs
### Against all Individual Defendants

99.     The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

100.     Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

101.     At the time the documents incorporated by reference in the 2016 Notes Offering Materials were filed, Corzine was a director of MF Global.

102.     As set forth above, the 2016 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2016 Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

103.   The Individual Defendants owed to the 2016 Note Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2016 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

104.   The Individual Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2016 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2016 Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

105.   The Individual Defendants were negligent in failing to conduct a reasonable investigation of the statements contained in the 2016 Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

106.   The Lord Abbett Plaintiffs and the Waterstone Plaintiffs purchased the 2016 Notes issued pursuant or traceable to the 2016 Notes Offering Materials, and were damaged thereby.

107.   The Lord Abbett Plaintiffs and the Waterstone Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired their securities.

108.   Therefore, the Individual Defendants are liable to the Lord Abbett Plaintiffs and the Waterstone Plaintiffs for violations of Section 11 of the '33 Act.

36

**COUNT III**
**Section 12(a)(2) of the '33 Act**
**On behalf of the 2016 Note Plaintiffs**
**Against the Underwriter Defendants**

109.     The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

110.     Underwriter Defendants are sellers within the meaning of the '33 Act because they transferred title to purchasers of MF Global's 2016 Notes in the 2016 Notes Offering.

111.     As alleged herein, the 2016 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2016 Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

112.     The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

113.     The Underwriter Defendants owed to 2016 Note Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2016 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

114.     The Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2016 Notes Offering Materials and did not possess reasonable grounds for believing that the 2016 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

115.    The 2016 Note Plaintiffs purchased MF Global's 2016 Notes in the 2016 Notes Offering, and were damaged thereby.

116.    The 2016 Note Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired the securities.

117.    Therefore, the Underwriter Defendants are liable to the 2016 Note Plaintiffs for violations of Section 12(a)(2) of the '33 Act. The 2016 Note Plaintiffs hereby tender their 2016 Notes to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

**COUNT IV**
**Section 15(a) of the '33 Act**
**On behalf of the Lord Abbett Plaintiffs and the Waterstone Plaintiffs**
**Against the Officer Defendants**

118.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

119.    MF Global violated Section 11 of the '33 Act by issuing the 2016 Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

120.    The Officer Defendants were controlling persons of MF Global when the 2016 Notes Offering Materials were filed and became effective, because of their senior executive positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

121.     By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the 2016 Notes Offering Materials.

122.     The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 2016 Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

123.     The Lord Abbett Plaintiffs and the Waterstone Plaintiffs purchased MF Global's 2016 Notes pursuant or traceable to the 2016 Notes Offering Materials, and were damaged thereby.

124.     The Lord Abbett Plaintiffs and the Waterstone Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired 2016 Notes.

125.     Therefore, the Officer Defendants are liable to The Lord Abbett Plaintiffs and the Waterstone Plaintiffs for violations of Section 15(a) of the '33 Act.

**COUNT V**
**Section 11 of the '33 Act**
**On behalf of 2018 Note Plaintiffs**
**Against all Underwriter Defendants (except Sandler)**

126.     The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

127.     Underwriter Defendants Citi, DB, Goldman, Merrill, J.P. Morgan, and RBS underwrote the 2018 Notes Offering.

128.    As set forth above, the 2018 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2018 Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

129.    The Underwriter Defendants owed to the 2018 Note Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2018 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

130.    The Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2018 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2018 Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

131.    The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 2018 Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the

investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements, assessments of internal controls, and other disclosures, and they were negligent in failing to do so sufficiently in connection with the 2018 Notes Offering.

132.   The 2018 Note Plaintiffs purchased the 2018 Notes issued pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

133.   The 2018 Note Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired their securities.

134.   Therefore, the Underwriter Defendants are liable to the 2018 Note Plaintiffs for violations of Section 11 of the '33 Act.

**COUNT VI**
**Section 11 of the '33 Act**
**On behalf of all 2018 Note Plaintiffs (except Lazard)**
**Against all Individual Defendants**

135.   The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

136.   Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

137.   At the time the documents incorporated by reference in the 2018 Notes Offering Materials were filed, Corzine was a director of MF Global.

138.   As set forth above, the 2018 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2018 Notes Offering Materials omitted to state other facts required to be stated

therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

139.   The Individual Defendants owed to the 2018 Note Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2018 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

140.   The Individual Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2018 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2018 Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

141.   The Individual Defendants were negligent in failing to conduct a reasonable investigation of the statements contained in the 2018 Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

142.   The 2018 Note Plaintiffs purchased the 2018 Notes issued pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

143.   The 2018 Note Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired their securities.

144.    Therefore, the Individual Defendants are liable to the 2018 Note Plaintiffs (except Lazard) for violations of Section 11 of the '33 Act.

## COUNT VII
### Section 12(a)(2) of the '33 Act
### On behalf of all the 2018 Note Plaintiffs
### Against the Underwriter Defendants (except Sandler)

145.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

146.    Underwriter Defendants Citi, DB, Goldman, Merrill, J.P. Morgan, and RBS are sellers within the meaning of the '33 Act because they transferred title to purchasers of MF Global's 2018 Notes in the 2018 Notes Offering.

147.    As alleged herein, the 2018 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2018 Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

148.    The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

149.    These Underwriter Defendants owed to 2018 Note Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2018 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

150.    These Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2018 Notes Offering

Materials and did not possess reasonable grounds for believing that the 2018 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

151.    The 2018 Note Plaintiffs purchased MF Global's 2018 Notes in the 2018 Notes Offering, and were damaged thereby.

152.    The 2018 Note Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired the securities.

153.    Therefore, Underwriter Defendants Citi, DB, Goldman, Merrill, J.P. Morgan, and RBS are liable to the 2018 Note Plaintiffs for violations of Section 12(a)(2) of the '33 Act. The 2018 Note Plaintiffs hereby tender their 2018 Notes to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

### COUNT VIII
### Section 15(a) of the '33 Act
### On behalf of the 2018 Note Plaintiffs (except Lazard)
### Against the Officer Defendants

154.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

155.    MF Global violated Section 11 of the '33 Act by issuing the 2018 Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

156.    The Officer Defendants were controlling persons of MF Global when the 2018 Notes Offering Materials were filed and became effective, because of their senior executive

positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

157.   By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the 2018 Notes Offering Materials.

158.   The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 2018 Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

159.   The 2018 Note Plaintiffs purchased MF Global's 2018 Notes pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

160.   The 2018 Note Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired 2018 Notes.

161.   Therefore, the Officer Defendants are liable to the 2018 Note Plaintiffs (except Lazard) for violations of Section 15(a) of the '33 Act.

**COUNT IX**
**Section 11 of the '33 Act**
**On behalf of the Waterstone Funds**
**Against all Senior Notes Underwriter Defendants**

162.   The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

163.   The Senior Notes Underwriter Defendants underwrote the Senior Notes Offering.

164.   As set forth above, the Senior Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the Senior Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the Senior Notes Offering Materials.

165.   The Senior Note Underwriter Defendants owed to the Senior Note Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Senior Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

166.   The Senior Notes Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Senior Notes Offering Materials, and did not possess reasonable grounds for believing that the Senior Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

167.   The Senior Notes Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Senior Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF

46

Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements, assessments of internal controls, and other disclosures, and they were negligent in failing to do so sufficiently in connection with the 2018 Notes Offering.

168.    The Waterstone Funds purchased the Senior Notes issued pursuant or traceable to the Senior Notes Offering Materials, and were damaged thereby.

169.    The Waterstone Funds did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Senior Notes Offering Materials when they purchased or acquired their securities.

170.    Therefore, the Senior Notes Underwriter Defendants are liable to the Waterstone Funds for violations of Section 11 of the '33 Act.

**COUNT X**
**Section 11 of the '33 Act**
**On behalf of the Waterstone Funds**
**Against all Individual Defendants**

171.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

172.    Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

173.    At the time the documents incorporated by reference in the Senior Notes Offering Materials were filed, Corzine was a director of MF Global.

174.    As set forth above, the Senior Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF

Global. In addition, the Senior Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the Senior Notes Offering Materials.

175.    The Individual Defendants owed to the Waterstone Funds the duty to make a reasonable and diligent investigation of the statements contained in the Senior Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

176.    The Individual Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Senior Notes Offering Materials, and did not possess reasonable grounds for believing that the Senior Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

177.    The Individual Defendants were negligent in failing to conduct a reasonable investigation of the statements contained in the Senior Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

178.    The Waterstone Funds purchased the Senior Notes issued pursuant or traceable to the Senior Notes Offering Materials, and were damaged thereby.

179.    The Waterstone Funds did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Senior Notes Offering Materials when they purchased or acquired their securities.

180.    Therefore, the Individual Defendants are liable to the Waterstone Funds for violations of Section 11 of the '33 Act.

## COUNT XI
### Section 12(a)(2) of the '33 Act
### On behalf of the Waterstone Funds
### Against Jefferies

181.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

182.    Jefferies is a seller within the meaning of the '33 Act because they transferred title to purchasers of MF Global's Senior Notes in the Senior Notes Offering.

183.    As alleged herein, the Senior Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the Senior Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

184.    The misstated and omitted facts would have been material to a reasonable person reviewing the Senior Notes Offering Materials.

185.    Jefferies owed to Waterstone Funds the duty to make a reasonable and diligent investigation of the statements contained in the Senior Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

186.    Jefferies did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Senior Notes Offering Materials and did not possess reasonable grounds for believing that the Senior Notes Offering Materials did not

contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

187.    The Waterstone Funds purchased MF Global's Senior Notes in the Senior Notes Offering from Jefferies, and were damaged thereby.

188.    The Waterstone Funds did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Senior Notes Offering Materials when they purchased or acquired the securities.

189.    Therefore, Jefferies is liable to the Waterstone Funds for violations of Section 12(a)(2) of the '33 Act. The Waterstone Funds hereby tender their Senior Notes to Jefferies and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT XII
### Section 15(a) of the '33 Act
### On behalf of the Waterstone Funds
### Against the Officer Defendants

190.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

191.    MF Global violated Section 11 of the '33 Act by issuing the Senior Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the Senior Notes Offering Materials.

192.    The Officer Defendants were controlling persons of MF Global when the Senior Notes Offering Materials were filed and became effective, because of their senior executive positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

193.    By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the Senior Notes Offering Materials.

194.    The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Senior Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

195.    The Waterstone Funds purchased MF Global's Senior Notes pursuant or traceable to the Senior Notes Offering Materials, and were damaged thereby.

196.    The Waterstone Funds did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Senior Notes Offering Materials when they purchased or acquired the Senior Notes.

197.    Therefore, the Officer Defendants are liable to the Waterstone Funds for violations of Section 15(a) of the '33 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request an Order and Judgment from the Court as follows:

1. Determining that Defendants have violated Sections 11, 12, and 15 of the '33 Act and awarding Plaintiffs compensatory damages, rescission, or rescissory damages in an amount to be determined at trial, including pre-judgment interest, attorneys' fees, and costs; and

2. Granting Plaintiffs such further and other relief as the Court deems just and necessary.

Dated: January 22, 2014

ROSS & ORENSTEIN LLC

Jeff Ross
John Orenstein
Harry Niska
222 South Ninth Street, Suite 470
Minneapolis, MN 55402
Telephone: (612) 436-9800

**ATTORNEYS FOR PLAINTIFFS**